**Jennifer TRAHAN and Alto Trahan, Appellants,**

v.

**LONE STAR TITLE COMPANY OF EL PASO, INC., Appellee.**

No. 08-05-00293-CV.

Court of Appeals of Texas, El Paso.

July 26, 2007.

---

7. As defined, *inter alia*, in Section 11.001(b).

Michael R. "Mickey" Milligan, El Paso, TX, for Appellants.

Steven L. Hughes, Mounce, Green, Myers, Safi & Galatan, El Paso, TX, for Appellee.

Before CHEW, C.J., McClURE, and CARR, JJ.

## OPINION

DAVID WELLINGTON CHEW, Chief Justice.

This appeal involves a mortgage closing dispute between Appellants Jennifer Trahan and Alto Trahan ("the Trahans") and Appellee Lone Star Title Company of El Paso, Inc. ("Lone Star"), the escrow agent. The Trahans challenge the trial court's

granting of a no-evidence summary judgment in favor of Lone Star, various trial court rulings, and the denial of their motion to recuse the trial judge. We affirm.

On November 12, 2003, the Trahans refinanced their home with Amerigroup Mortgage Corporation ("Amerigroup"). Lone Star acted as the settlement agent for the closing. The summary of the transaction in the HUD–1 Settlement Statement listed county taxes in the amount of $3,613.03 as due by the borrowers and required by the lender to be paid in advance. This amount was included in the Trahans' total settlement charges. The Trahans signed the Statement's certification, to "direct and authorize [Lone Star] to make the distributions indicated for my account on the attached HUD–1 Settlement Statement" and that they understood "that prorations were based on figures for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Borrower direct." They also certified that they had "carefully reviewed the HUD–1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction." Graciela ("Gracie") Cadena was Lone Star's closing agent in the transaction. Ms. Cadena certified that to the best of her knowledge the HUD–1 Settlement Statement which she had prepared was a true and accurate account of the funds which were received and have been or will be disbursed by Lone Star as part of the settlement of the transaction. According to Mrs. Trahan, Ms. Cadena told the Trahans that $3,613.03 had been added into their loan to pay the ad valorem taxes on the property. Mrs. Trahan told Ms. Cadena that the taxes had already been paid by their former lender, Waterfield Mortgage Company. Ms. Cadena told the Trahans that once the tax payment was posted at the County Tax Office, she would refund the amount that Waterfield had paid. The Trahans signed the Settlement Statement based on what Ms. Cadena told them about the tax refund.

On November 20, Ms. Cadena informed the Trahans that Lone Star was issuing them a check in the amount of $2,505.97 as a refund for overpayment of taxes. The next morning, the Trahans picked up the check. Later that afternoon, Ms. Cadena called the Trahans asking for the check back or else she would stop payment on the check. The Trahans, however, had already cashed the check and had spent most of the money paying bills. Lone Star stopped payment on the check, informing its banker that the check had been "lost or misplaced." On December 1, 2003, Mrs. Trahan spoke with Ms. Cadena and during their conversation, Ms. Cadena made numerous statements to Mrs. Trahan as to why she was not entitled to the money. Mrs. Trahan spoke with Mike Blough, Chief Financial Officer of Lone Star on December 17. Based on her conversation with Mr. Blough, Mrs. Trahan believed that the refund money had been sent to Amerigroup and the loan had been reduced by $2,500. Over a period of several months, the $2,505.07 was not applied to the loan and Mrs. Trahan received no response from Lone Star. In April 2004, the Trahans' attorney, Michael "Mickey" Milligan, sent a pre-suit demand letter to Lone Star. By letter dated May 14, 2004, Lone Star's attorney, Darryl Vereen, responded to the demand letter, informing the Trahans that Lone Star had the disputed funds in escrow because both the Trahans and their lender claimed to own the funds. In the May 14 letter, Mr. Vereen requested that Mr. Milligan contact him within a week with an agreement between the Trahans and the lender as to how the funds

should be handled. Mr. Vereen further stated, "[o]therwise, my client may not have any other choice but to interplead the funds. This is something we are hoping to avoid." On May 25, 2004, at the lender's direction, Lone Star issued a check payable to Amerigroup on behalf of the Trahans' account, in the amount of $2,565.29.

On October 20, 2004, the Trahans filed suit against Lone Star, alleging breach of contract, theft, fraud, and breach of its fiduciary duties as the escrow agent for the closing. On July 6, 2005, Lone Star filed a no-evidence summary judgment motion, in which it challenged elements of each cause of action and exemplary damages. During the course of litigation, a visiting judge denied the Trahans' motion to recuse the trial judge and then the trial court granted Lone Star's motions for discovery sanctions and to designate a responsible third party, denied the Trahans' objection to the official court reporter, granted Lone Star's objection to the Trahans' summary judgment evidence, and granted Lone Star's no-evidence motion for summary judgment. The Trahans now bring this appeal.

## MOTION TO RECUSE

First, we will address the Trahans' contention that the visiting judge abused her discretion by denying their motion to recuse the trial judge, the Honorable Luis Aguilar. The Trahans filed a motion to recuse Judge Aguilar, claiming that the judge's derogatory and demeaning remarks at a pretrial hearing conducted on May 5, 2005, demonstrated that Judge Aguilar's impartiality might reasonably be questioned and that Judge Aguilar had a personal bias or prejudice against the subject matter of the case, the Trahans' attorney and/or the Trahans. *See* Tex.R.Civ.P. 18b(2)(a), (b). The motion also alleged further bias and prejudice in that the offi-

cial court reporter failed to make a record of the May 5 hearing and Judge Aguilar's behavior at the hearing was part of a continuing course of conduct of persistent use of derogatory and demeaning remarks in the courtroom for which the judge had been publicly reprimanded on December 21, 2004. After a hearing, the visiting judge denied the Trahans' recusal motion.

We review the judge's ruling for an abuse of discretion. *See* Tex.R.Civ.P. 18a(f); *Chandler v. Chandler*, 991 S.W.2d 367, 385 (Tex.App.-El Paso 1999, pet. denied); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). In reviewing the denial of a recusal motion, we apply a reasonable person standard in determining whether the alleged act or acts indicating bias or impartiality emanated from an extrajudicial source. *See Chandler*, 991 S.W.2d at 385; *Ludlow v. DeBerry*, 959 S.W.2d 265, 281 (Tex.App.-Houston [14th Dist.] 1997, no writ)(Opin. on reh'g). A judge's opinions formed on the basis of facts introduced or events occurring during trial court proceedings do not constitute a basis for a recusal motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *See Liteky v. U.S.*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994); *Chandler*, 991 S.W.2d at 385–86; *Ludlow*, 959 S.W.2d at 271. Thus, judicial remarks during the course of a trial that are critical or disapproving or even hostile to counsel, parties, or their cases, ordinarily do not support recusal. *Liteky*, 510 U.S. at 555, 114 S.Ct. at 1157; *Chandler*, 991 S.W.2d at 386; *Ludlow*, 959 S.W.2d at 271. Rather, such remarks may support recusal if they reveal an opinion deriving from an extrajudicial source and such remarks will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. *Liteky*, 510 U.S. at 555,

114 S.Ct. at 1157; *Chandler*, 991 S.W.2d at 386; *Ludlow*, 959 S.W.2d at 271. Otherwise, "[a] judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune." *Liteky*, 510 U.S. at 556, 114 S.Ct. at 1157.

At the recusal hearing, Mr. Milligan testified about Judge Aguilar's conduct at the May 5, 2005 hearing on Lone Star's Motion for Leave to Designate Responsible Third Party and his motion for a continuance. Judge Aguilar heard Lone Star's motion first. Mr. Milligan argued in response to Lone Star's motion, directing Judge Aguilar to the deposition testimony and transcripts attached to the Trahans' response. According to Mr. Milligan, when he handed the documents to Judge Aguilar, he pitched them across the bench and said "I'm not going to read that. I don't have to read it." Judge Aguilar told Mr. Milligan to tell him what the attachments said and Mr. Milligan replied that he could not recite all the evidence in such a short time and asked the judge to just read it. Judge Aguilar then screamed at Mr. Milligan, stating twice in a loud voice "[i]f I believe what Mr. Vereen tells me, I'm going to poor [sic] you out without a jury trial and I've been known to do it before." According to Mr. Milligan, the judge's statement was directed to him, not Mr. Vereen, and he interpreted it as telling him that he was never getting a jury trial in this case.

At some point, Judge Aguilar asked the parties about the possibility of mediation in the case. Mr. Milligan informed the judge that mediation was not going to work out right now. Judge Aguilar asked why he thought that and Mr. Milligan replied, "[b]ecause I've been doing this a long time.... And what I found is a lot of times mediation becomes more viable the closer we get to trial." In response, Judge Aguilar started to scream at him, stating, "[d]on't tell me how to practice law" and "I've tried 140 cases." As Mr. Milligan tried to apologize, Judge Aguilar picked up the court file, raising it up with both hands. Judge Aguilar then looked at Mr. Vereen and asked the same question about mediation to which Mr. Vereen also replied that mediation was not going to work. Judge Aguilar then screamed and said, "That's all I want, a simple answer to a simple question" and threw the file. Mr. Milligan believed the judge's anger was directed at him, not Mr. Vereen.

Mr. Milligan testified about Judge Aguilar's hostile demeanor towards him in the courtroom with regard to his motion for a continuance. According to Mr. Milligan, Judge Aguilar called the case himself and in a snide manner remarked, "what's this about your [sic] not feeling well," even though the judge knew that Mr. Milligan was recovering from a heart attack and had filed a doctor's certificate along with the motion for a continuance. Mr. Milligan recalled that the judge was angry that Mr. Vereen did not oppose the motion.

During the May 5 hearing, Mr. Milligan observed the court reporter, Jason Mestas, moving his hands on his stenographer's machine, not on his computer, and believed that Mr. Mestas was making a record of the proceedings. After the hearing, Mr. Milligan asked Mr. Mestas to prepare a copy of the transcript from the hearing. A few days later, Mr. Mestas informed Mr. Milligan that there was no record because the case was not called.

Mr. Milligan testified that he felt hostility from Judge Aguilar at the May 5 hearing. Based on the way he and his clients' case was treated that day and the fact that there was no record of that hearing, even though he watched the court reporter take the record, he did not believe his clients

could get a fair trial before Judge Aguilar. Mr. Milligan also believed that Judge Aguilar had exhibited such a high degree of antagonism toward him and his clients and such a high degree of favoritism toward Mr. Vereen's clients that the judge should be recused from the case. Similarly, Mrs. Trahan testified that Judge Aguilar was angry and raised his voice when speaking to her attorney at the hearing. She recalled the judge taking the file and slamming it down. Mrs. Trahan also remembered the judge saying that if Mr. Vereen convinced him, he was going to pour out their case. Mrs. Trahan believed that Judge Aguilar belittled and berated Mr. Milligan to a level that demonstrated favoritism toward Mr. Vereen and antagonism toward Mr. Milligan.

Contrary to Mr. Milligan's and Mrs. Trahan's testimony, Lynda Menapace, the court coordinator, did not recall Judge Aguilar yelling or screaming at anyone or picking up papers and slamming them down. She explained that the judge does not like to grant continuances and usually gives the person asking for a continuance a hard time and always requires a hearing before granting a motion for a continuance, which are infrequently granted. With regard to the mediation discussion, Ms. Menapace recalled that the judge asked Mr. Milligan why he thought they might go to mediation later and Mr. Milligan said something about his opinion being based on decades of experience. Judge Aguilar then began comparing his own trial experience to Mr. Milligan's, but the judge did not scream or yell or lose his temper. As for the comment about pouring out the case, Ms. Menapace believed Judge Aguilar was talking to Mr. Vereen. Ms. Menapace thought the judge's comment was made in reference to Mr. Vereen's argument on his motion in which he was pointing the finger at a third party and the judge replied that if there was

nothing there, he was going to pour it out. She did not think the judge displayed favoritism toward Mr. Vereen, but rather treated both attorneys equally. Ms. Menapace testified that there was no record of the hearing because no one asked to put it on the record and the judge never called the case.

Jason Mestas, the court reporter, testified that the bailiff, not the judge called the case on May 5. Mr. Mestas recalled stating in his affidavit that he began reporting the case, but then it moved into a very informal posture with overlapping conversations and professional jovial comments. Mr. Mestas explained that he usually reports what the bailiff calls out as a frame of reference in his notes to mark when a case ends or begins. Mr. Mestas stated that as usual practice, the docket moves very fast and not always in sequence. The judge normally informs him when there is something to be put on the record and calls all the cases in a similar manner. However, when the bailiff calls the case, it is not on record, but he does make references in his notes to locate the information, which helps him to prepare a more accurate record. Mr. Mestas then waits for the judge to call the case. When this particular case moved into an informal posture, Mr. Mestas proceeded to clean up earlier docket matters on his computer because it did not seem like he was reporting anything. Because no one called the case, he just moved on to other things. When he noticed that things started to heat up, he was ready for them to give him direction and go on the record. As to the actual proceeding, Mr. Mestas recalled that comments were made to incite the judge to anger and given the judge's "strong personality," he responded. Mr. Mestas had heard Judge Aguilar yell a lot louder than he did at the hearing. He did not remember the judge picking up any

papers or a file. Judge Aguilar did not tell him not to record the hearing. If Mr. Milligan or Mr. Vereen had asked him to make a record of the hearing, he would have done so, but neither did.

Mr. Vereen testified at the recusal hearing. He explained that it was his understanding that the court's ruling on his motion for leave to designate responsible third party was to be based solely on the face of the pleading, not on outside evidence. Therefore, evidence such as deposition testimony or telephone transcripts that Mr. Milligan presented in response to the motion was irrelevant. In response to Mr. Milligan's argument, Mr. Vereen stated that he felt his pleadings were sufficient to satisfy the pleading requirements, that it was his job to present evidence at trial to support the allegations, and if he did not, then it was the judge's job to pour him out. Judge Aguilar then looked at Mr. Vereen and said "that's right. I will pour you out." The judge then addressed both attorneys generally and said "I've granted summary judgments and I've granted directed verdicts, and I will do that." According to Mr. Vereen, the words "pouring out" came from him, and then the judge said "I will pour you out" while looking directly at Mr. Vereen and in response to the allegations he had made in his motion for leave to designate responsible third party.

Mr. Vereen did not recall Judge Aguilar screaming or yelling at Mr. Milligan. He did recall the judge having a number of files on the bench and setting one down a littler harder during the conversation, but he did not think it was as big a deal as was described at the recusal hearing. However, he did not recall the judge picking up Mr. Milligan's response to his motion for leave and pitching it across the bench. Based on what he saw at the hearing, Mr. Vereen did not believe Judge Aguilar displayed favoritism towards himself or his client nor did he believe the judge displayed antagonism towards Mr. Milligan or his clients. Mr. Vereen also did not think a reasonable person would question Judge Aguilar's impartiality on the case nor had the judge expressed a personal bias or prejudice about the merits of the case.

After close review of the recusal hearing record, we can not find that it was an abuse of discretion to deny the recusal motion. The judge's actions which form the basis of the Trahans' complaint occurred during court proceedings and the Trahans have not asserted that his statements emanated from an extrajudicial source. While we certainly do not condone the sort of behavior alleged by the Trahans, the visiting judge was presented with conflicting evidence concerning Judge Aguilar's conduct at the May 5 hearing, some of which supports the visiting judge's implicit finding that Judge Aguilar did not display a high degree of favoritism toward Mr. Vereen or Lone Star or a high degree of antagonism toward Mr. Milligan and the Trahans and did not express a personal bias or prejudice concerning the subject matter of the case or a party. Therefore, we conclude the visiting judge did not abuse her discretion in denying the motion to recuse on the basis of impartiality or personal bias and prejudice. Issue Five is overruled.

## OBJECTION TO COURT REPORTER

In Issue Three, the Trahans contend the trial court abused its discretion by denying their Third Objection to Official Court Reporter Jason Mestas. Specifically, the Trahans argued in their motion that the trial court should have disqualified Mr. Mestas from reporting further proceedings in the case because: (1) he failed to make a record of the May 5 hearing, even

though he admitted in his affidavit that he began reporting and then stopped; (2) he was a witness at the recusal hearing; and (3) Mr. Milligan had filed a formal complaint against Mr. Mestas with the Court Reporters Certification Board.

■■ The appellate record shows that with regard to the May 5 hearing, neither party requested that the court reporter make a record of the proceeding. *See* Tex.Gov't Code Ann. § 52.046(a)(2)(Vernon 2005)(on request, an official court reporter shall take full shorthand notes of oral testimony offered before the court). Further, Mr. Mestas was subpoenaed by the Trahans to testify at the recusal hearing and there is nothing in his testimony that indicates even the appearance of partiality. Relying on the Standards and Rules for Certification of Shorthand Reporters, promulgated by the Texas Supreme Court, the Trahans also claim that Mr. Mestas demonstrated unprofessional conduct by failing to produce an accurate transcript and by reporting on a matter in which he has a financial interest. Without citing any authority, the Trahans contend that Mr. Mestas should not have reported further proceedings in the case, at least until the complaint against him was finally resolved. However, since the Court Reporter Certification Board had not yet determined in its disciplinary proceedings whether Mr. Milligan's complaint against Mr. Mestas was in fact meritorious, we cannot conclude the trial court abused its discretion by failing to disqualify or recuse Mr. Mestas from performing his duties as the official court reporter of the 120th Judicial District Court. *See* Tex.Gov't Code Ann. §§ 52.027(a), 52.029(a)(providing the Legislature's disciplinary scheme for complaints filed against certified shorthand reporters for specified conduct, including unprofessional conduct); *see also* Tex.Gov't Code Ann. § 52.041 (official

court reporter is a sworn officer of the court). Issue Three is overruled.

### SANCTIONS

In Issue Four, the Trahans argue the trial court abused its discretion by awarding discovery sanctions. The trial court conducted a hearing on Lone Star's Second Motion to Compel, Motion for Sanctions, and Motion for Entry of Order on July 7, 2005. At the conclusion of the July 7 hearing, the trial court granted Lone Star's motion for sanctions and supplement motion for sanctions, ruling that: (1) the Trahans would produce any and all witness statements within five days to the defense; (2) statements by Ms. Cadena and Mr. Blough produced by the Trahans could not be used against them; (3) all discovery responses prior to their disposition would not be allowed; (4) leave would be granted to amend and supplement all discovery responses by Lone Star; and (5) $2,970 would be awarded as attorney's fees, $660 as compensation for deposition preparation, and $750 in sanctions. On August 1, 2005, the trial court entered the sanctions order, which in relevant part provides:

**IT IS ORDERED** that Plaintiffs and their attorney produce all statements, together with any recordings or transcripts, to Defendant on or before **July 12, 2005.**

**IT IS FURTHER ORDERED** that Defendant is granted leave to amend or supplement its discovery responses, including Responses to Requests for Admission and deposition testimony in response to the statements produced by Plaintiffs in this matter, to the extent Defendant feels it necessary to do so.

**IT IS FURTHER ORDERED** that any discovery responses provided by Defendant before Plaintiffs produced the statements, may not be used against Defendant as being inconsistent with any of the state-

ments, particularly with regard to the witnesses Mike Blough and Gracie Cadena.

**IT IS FURTHER ORDERED** that the statements produced by Plaintiff shall not be used against Defendant, and are excluded for that purpose.

**IT IS FURTHER ORDERED** that Plaintiffs pay sanctions to Defendant in the sum of $4,380.00 on or before **July 14, 2005.**

 A trial court may impose sanctions on any party that abuses the discovery process. *See* Tex.R.Civ.P. 215.3, 215.2. The trial court's ruling on a motion for sanctions is reviewed for an abuse of discretion. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex.2004). A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Id.* at 838–39. The sanctions imposed must be just. *See TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991). In determining whether imposition of a sanction is just, the reviewing court must first determine whether a direct relationship exists between the offensive conduct and the sanction imposed. *Id.* In other words, a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. *Id.* Second, the reviewing court must consider whether the sanction imposed is excessive—the punishment must fit the crime. *Id.* A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. *Id.*

The record shows that on October 20, 2004, the same date that the Trahans sued

Lone Star, they served their first request for admissions on Lone Star. Thirteen out of twenty-five requests specifically requested admissions concerning details from a telephone conversation between Mrs. Trahan and Mr. Blough on December 17, 2003 and a telephone conversation between Mrs. Trahan and Ms. Cadena on December 1, 2003. At the July 7 sanctions hearing, Mrs. Trahan testified that when she filed the lawsuit, she had in her possession tape recordings of telephone conversations with Mr. Blough, Ms. Cadena, Amerigroup employees, GMAC, the Veterans Administration, and Waterfield Mortgage. Mrs. Trahan readily admitted that she prepared the first request for admissions based on recorded statements she had from Mr. Blough and Ms. Cadena.

On November 8, 2004, Lone Star served its request for disclosure upon the Trahans, requesting disclosure of information and material described in Tex. R.Civ.P. 194.2(a)-(*l*).[1] The Trahans responded to the request for disclosure on December 3, 2004. They disclosed the following items: Mrs. Trahans' original complaint to the Texas Department of Insurance and subsequent statements by Mrs. Trahan to the Texas Department of Insurance; the response by John Martin of Lone Star to the Texas Department of Insurance and Mr. Martin's subsequent statements to that agency; an e-mail from Robert R. Carter, Jr., Deputy Commissioner of Texas Department of Insurance to Mrs. Trahan; and a letter from Ronda Alexander, an Insurance Specialist with the Texas Department of Insurance, to

---

1. Under Rule 194.2, a party may request disclosure of any witness statements described in Rule 192.3(h). *See* Tex.R.Civ.P. 194.2(i). Rule 192.3(h) provides that "[a] party may obtain discovery of the statement of any person with knowledge of relevant facts—a 'witness statement'—regardless of when the state-

ment was made." Tex.R.Civ.P. 192.3(h). A witness statement as defined by the Rule includes "a stenographic, mechanical, electrical, or other type of recording of a witness's oral statement, or any substantially verbatim transcription of such a recording." *Id.*

the Trahans. At the July 7 sanctions hearing, Mrs. Trahan admitted that she prepared the response to the request for disclosure without referencing any of the recorded statements she possessed. Mrs. Trahan testified that she thought "witness statements" meant only signed witness statements, not audio recordings, and therefore she only disclosed signed witness statements. Mrs. Trahan stated that her attorney, Mr. Milligan, had reviewed the response and at the time was aware that she had some audio recordings, but he had never listened to them and did not know their content. Mr. Milligan admitted that when they responded to the request for disclosure, he knew Mrs. Trahan had recordings of telephone conversations with Mr. Blough and Ms. Cadena. Mr. Milligan admitted that he intended to question Mr. Blough and Ms. Cadena about the telephone conversations as well. He testified that the failure to disclose the tape recordings was an oversight with regard to current discovery rules.

By letter dated December 7, 2004, Mr. Milligan asked to schedule the oral deposition of Ms. Cadena and Mr. Blough, suggesting dates in January 2005. Mrs. Trahan testified that by December 7, she had told Mr. Milligan that she had audio recordings of Mr. Blough and Ms. Cadena, Lone Star employees, but he had not listened to them. By letter dated December 17, Lone Star agreed to schedule the depositions for January 18, 2005. Mr. Vereen informed Mr. Milligan that he would be sending the request for production the next week and twice asked Mr. Milligan to extend the courtesy of a response before the depositions were taken. On December 22, 2004, Lone Star sent its request for production, specifically requesting that the Trahans produce any statement, including the original of any tapes or recordings, taken from Lone Star agents, employees, or representatives, and such statements from "any person involved with any of the matters raised in this lawsuit, or from their agents, employees or representatives."

On January 18, 2005, the Trahans took the oral depositions of Ms. Cadena and Mr. Blough. During the depositions, Mr. Milligan asked specific questions to Ms. Cadena about her December 1 telephone conversation with Mrs. Trahan. Mr. Milligan also asked specific questions to Mr. Blough about his December 17 telephone conversation with Mrs. Trahan. At the July 7 sanctions hearing, Mrs. Trahan admitted that she used the undisclosed recorded statements to prepare the questions that Mr. Milligan was going to ask at the depositions. Likewise, Mr. Milligan admitted that he never told Mr. Vereen about the recordings before Ms. Cadena and Mr. Blough were deposed. He admitted that he reviewed the transcriptions of the audio recordings of Ms. Cadena and Mr. Blough before he deposed them. Mr. Milligan also admitted that he failed to produce the transcripts before the depositions and by that point he was busy preparing the response to the request for production.

On January 24, 2005, the Trahans responded to Lone Star's request for production. At that time, the Trahans gave Lone Star copies of tape recordings of conversations between Mrs. Trahan and Ms. Cadena on December 1, 2003; between Mrs. Trahan and Mr. Blough on December 17, 2003; and between Mrs. Trahan and Debra Nerod, an Amerigroup employee, on December 1, 2003. Their response also stated that the Trahans would produce copies of tape recordings of conversations with three other Amerigroup employees and another conversation with Ms. Nerod taken on November 28, 2003.

Lone Star filed a motion to compel and the trial court conducted a hearing on the motion on March 3, 2005. Following the hearing, the parties entered into a discovery stipulation, in which the Trahans agreed to produce the original recordings for review and transcription by Lone Star prior to the Trahans' depositions. The parties also agreed to supplementation with regard to any responsive information in their possession or subject to their control within seven days from the date of the stipulation. As previously mentioned, at the July 7 sanctions hearing, Mrs. Trahan testified that she possessed tape recordings of telephone conversations with employees from GMAC, the Veterans Administration, and Waterfield Mortgage—none of which was disclosed at the discovery conference.[2] According to Mrs. Trahan, Mr. Milligan did not know about these other statements until her deposition was taken and she had not disclosed the statements because she did not think they were relevant to the suit. Indeed, in the Trahans' first supplemental response to the requests for production on April 8, 2005, the Trahans produced only the transcripts of the audio recordings it had disclosed to date: (1) December 1, 2003 telephone conversation between Mrs. Trahan and Ms. Cadena; (2) December 17, 2003 telephone conversation between Mrs. Trahan and Mr. Blough; (3) December 1, 2003 telephone conversation between Mrs. Trahan and Ms. Nerod; (4) December 1, 2003 telephone conversation between Mrs. Trahan and "Leena" and "Roger" of Amerigroup; (5) November 28.2003 telephone conversation between Mrs. Trahan and "Manuel" of Amerigroup; (6) November 28, 2003 message left for John Martin,

President of Lone Star by Mrs. Trahan; and (7) November 28, 2003 telephone conversation between Mrs. Trahan and Ms. Nerod.

On May 17, 2005, Mrs. Trahan's oral deposition was taken. Mrs. Trahan testified that right after the stop payment of the check in late November, she purchased a tape recorder designed for recording telephone conversations. Mrs. Trahan decided to tape her telephone calls with Lone Star, MIC, and Amerigroup. During the deposition, Mrs. Trahan admitted that she may have recorded conversations with Waterfield. She stated that she did not give over that recording because she did not realize that Waterfield was going to be a witness in the case.[3] After further questioning, Mrs. Trahan admitted to Lone Star that she also had recordings of telephone conversations with the Veterans Administration and GMAC. At the July 7 sanctions hearing, Mrs. Trahan explained that she did not in her judgment think they had anything to do with the lawsuit, but agreed that she did not communicate her position to Lone Star. At the hearing, Mr. Milligan explained that his clients did not give the statements from GMAC and Amerigroup because they had filed a separate federal lawsuit against them with respect to the nature of the loan, which had nothing to do with Lone Star. Mr. Milligan claimed that he was aware of the recordings of conversations with personnel from the Veterans Administration and GMAC, but not the recording of Waterfield. The Trahans ultimately produced the additional recorded statements in their first supplemental response to Lone Star's request for disclosure on June 21, 2005.

2. Mrs. Trahan attended the March 3 motion to compel hearing, but did not testify.

3. Mrs. Trahan also stated that she came across the Waterfield recording after March 3 while reviewing tapes related to her federal lawsuit against GMAC and Amerigroup. She put it away and did not think of it until she was questioned by Mr. Vereen during her deposition.

Our review of the record shows that prior to filing the lawsuit, Mrs. Trahan secretly taped her telephone conversations with numerous parties, including Lone Star employees Ms. Cadena and Mr. Blough, and representatives of Amerigroup, GMAC, the Veterans Administration, and Waterfield Mortgage, in discussions regarding the refinancing transaction. Mrs. Trahan and Mr. Milligan failed to disclose the audio recordings of Ms. Cadena and Mr. Blough in response to Lone Star's first request for disclosure, claiming a misunderstanding of the discovery rules. This first set of audio recordings were not provided to Lone Star until after the depositions of Ms. Cadena and Mr. Blough were taken, even though Mrs. Trahan and Mr. Milligan knew of their significance and their intention to use the audio recordings to prepare their deposition inquiries. The Trahans only produced the first set of audio recordings in response to Lone Star's first request for production. At that time, the Trahans disclosed, but did not actually produce a second set of audio recordings. After Lone Star filed a motion to compel and the parties entered into a discovery stipulation, the Trahans agreed to produce the original recordings for review and transcription by Lone Star prior to the Trahans' depositions and to comply with supplementation procedures. At the May 17 deposition of Mrs. Trahan, however, an additional (third) set of audio recordings was revealed. Mrs. Trahan claimed that she did not disclose these additional audio recordings because she did not believe that they were relevant, even though Waterfield Mortgage, the previous mortgage lender, was included in this third set of audio recordings. At all times, either Mrs. Trahan or both Mrs. Trahan and Mr. Milligan had knowledge of the discoverable material and failed to comply with the discovery requests.

First, the Trahans assert that Ms. Cadena and Mr. Blough had an opportunity to change their sworn testimony to reflect their pre-suit telephone conversations, which Lone Star received six days after their depositions were taken. In effect, the Trahans argue that Lone Star was not prejudiced by their conduct because Lone Star's employees failed to take advantage of the opportunity to change their testimony. The Trahans, however, fail to address their delay in disclosing the first set of audio recordings that undisputedly were covered by the Lone Star's first request for disclosure. Not only did Mrs. Trahan and Mr. Milligan know the audio recordings existed, they planned to use this discoverable material in taking deposition testimony from Ms. Cadena and Mr. Blough. Prior to the depositions, Mr. Milligan knew the contents of the audio recordings of Ms. Cadena and Mr. Blough, but still did not disclose the materials and instead decided to wait until the Trahans' response to Lone Star's first request for production to disclose the relevant material.

Next, the Trahans claim that Lone Star waived its complaint by failing to object to the lack of timeliness in the delivery of the audio recordings of Ms. Cadena and Mr. Blough, noting that Lone Star did not complain about their conduct in its February 17, 2005 motion to compel, at the March 3 hearing on that motion, in response to their objection to Lone Star's motion for leave to designate responsible third party, or at the May 17 deposition of Mrs. Trahan. The Trahans cite to no authorities to support their contention. To the contrary, the case law indicates that as a general rule, only failure to obtain a pretrial ruling on discovery disputes constitutes a waiver of a claim for sanctions

based on that conduct. *See Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 170 (Tex.1993); *McKinney v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 772 S.W.2d 72, 75 (Tex. 1989).

The Trahans also excuse their conduct with respect to the additional recordings from GMAC, the Veterans Administration, and Waterfield Mortgage, asserting that none of those entities were listed by any party as a witness. They also claim none of those entities had relevant knowledge of the underlying suit. However, in Mrs. Trahan's deposition testimony, she testified that in the Waterfield recording, she called the agency and asked them about representations that Ms. Cadena had made to her about the escrow account funds. At a minimum, Mrs. Trahan knew that the Waterfield recording was covered by Lone Star's discovery request, but she inexplicably delayed its disclosure.

Next, the Trahans complain about the sanctions hearing, arguing that: (1) the trial court denied them the right to call Ms. Cadena and Mr. Blough as witnesses at the hearing; (2) the trial court said the truth was irrelevant, and entered an order that excludes the truth, thereby violating Canon 2.A, Code of Judicial Conduct; and (3) defense counsel failed to take remedial measures to correct the deposition testimony and thereby violated Rule 3.03 of the Rules of Professional Conduct by offering evidence he knew to be false. Contrary to the Trahans' contentions, the purpose of the sanctions hearing was to address the merits of Lone Star's motion for sanctions and supplemental motion, not about the truthfulness or untruthfulness of the content of the disputed witness statements. At the sanctions hearing, the Trahans attempted to call Ms. Cadena and Mr. Blough as witnesses to testify about whether they were aware of the telephone tapes before signing their depositions. The trial court permitted the Trahans to make a bill of exceptions, but did not permit the oral testimony. We cannot conclude the trial court abused its discretion in this regard because there is no evidence that their oral testimony would concern the Trahans' alleged delay in disclosing the audio recordings.

■■■■■ Finally, the Trahans contend the trial court arbitrarily awarded $2,970 in attorney's fees, $660 for deposition preparation, and $750 in sanctions, without evidence of defense counsel's legal fees. The Trahans also complain that the order is vague, without limitation, fails to state whether the Trahans will have an opportunity for additional discovery, purports to allow changes to original deposition testimony, and severely compromises their ability to present a viable claim. Contrary to the Trahans' contentions, we conclude the trial court's sanctions were just because there was a direct relationship between the Trahans' withholding of witness statements from representatives of Lone Star, Amerigroup, GMAC, the Veterans Administration, and Waterfield Mortgage and the sanction imposed, that is, allowing Lone Star to amend or supplement any prior discovery responses in response to the statements produced by the Trahans, not allowing any discovery responses provided by Lone Star before the Trahans produced the statements to be used for impeachment purposes, excluding the withheld statements from being used against Lone Star, and ordering the Trahans to pay $4,380 in monetary sanctions. The discovery sanctions were not so severe as to inhibit presentation of the merits of the case. *See Powell*, 811 S.W.2d at 918. Further, the sanction imposed for the discovery abuse was not excessive considering the time, effort, and expense incurred in compelling discovery. The bulk of the

monetary sanction represented attorney's fees of which the trial court presumably took judicial notice. *See Cire,* 134 S.W.3d at 844 (trial court can take judicial notice of the usual and customary fees awarded as a discovery sanction); *In re Estate of Kidd,* 812 S.W.2d 356, 359 (Tex.App.-Amarillo 1991, writ denied)(imposition of sanctions was presumptively based on judicial notice of reasonable attorney's fees and thus, supported by sufficient evidence). Moreover, $750 penalty was not too severe to satisfy its legitimate purpose of punishment and deterrence. *See Cire,* 134 S.W.3d at 839; *Powell,* 811 S.W.2d at 917–18. We conclude the trial court did not abuse its discretion by imposing sanctions against the Trahans. Issue Four is overruled.

### OBJECTION TO TRAHANS' SUMMARY JUDGMENT EVIDENCE

In Issue Two, the Trahans argue that the trial court abused its discretion by sustaining Lone Star's objections to the Trahans' summary judgment evidence, which they filed in response to Lone Star's motion for no-evidence summary judgment. We review the trial court's ruling for an abuse of discretion. *See Cantu v. Horany,* 195 S.W.3d 867, 871 (Tex.App.-Dallas 2006, no pet.).

Lone Star objected to several exhibits attached to the Trahans' response, including: Exhibits D, E, and G. The Trahans argue the trial court erred in sustaining Lone Star's objection to the following portion of Exhibit G (an excerpt of Ms. Cadena's deposition testimony):

> Q: When there's a dispute between the parties to a closing, does the title company have the authority to decide who is right and who is wrong and give the money to the party they think is right?
> Mr. Vereen: Objection, form.

A. No, sir.

In its objection, Lone Star argued that the question was improper because it required a conclusion of law, assumed facts not in evidence, and to the extent it was a hypothetical, it improperly omitted essential facts, and required speculation on the part of the witness. The Trahans assert the question was proper because Ms. Cadena, as Lone Star's employee and as the escrow officer who closed the loan, should have the knowledge to answer the question and further, she was an adverse party being cross-examined on a relevant issue. We agree with Lone Star that the question posed did call for a conclusion of law concerning the legal duty of a title company when there is a dispute between parties in a transaction at the closing. *See City of Fort Worth v. Pippen,* 439 S.W.2d 660, 665 (Tex.1969)(describing the fiduciary duties of an escrow agent).

The Trahans also challenge the exclusion of Exhibits D (a transcript of an audio recording of a telephone conversation between Mrs. Trahan and Ms. Cadena) and E (a transcript of an audio recording of a telephone conversation between Mrs. Trahan and Mr. Blough). Lone Star objected to these exhibits on the basis of impermissible hearsay, their exclusion pursuant to the court's sanctions order for discovery abuse, and pursuant to Tex. R.Evid. 1002, 1003. On appeal, the Trahans only challenge the exclusion of Exhibits D and E as a discovery sanction. When an appellee urges several objections to challenged evidence and on appeal, the appellant complains of its exclusion on only one of those bases, the appellant waives any error by not challenging all possible grounds for the trial court's ruling that sustained the objection. *Cantu,* 195 S.W.3d at 871, *citing Malone v. Foster,* 956 S.W.2d 573, 579 (Tex.App.-Dallas 1997), *affirmed on other grounds,* 977 S.W.2d 562

(Tex.1998); *see also Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.*, 64 S.W.3d 506, 513–14 (Tex. App.-Corpus Christi 2001, pet. denied). We conclude the trial court properly granted Lone Star's objection to Exhibit G and that the Trahans have waived any error as to the exclusion of Exhibits D and E. Issue Two is overruled.

## NO–EVIDENCE SUMMARY JUDGMENT

Issue One, the Trahans argue the trial court erred in granting Lone Star's no-evidence motion for summary judgment because their summary judgment evidence presented genuine issues of material fact as to each of the elements challenged in their causes of action for breach of contract, theft, fraud, and breach of fiduciary duty.

 A no-evidence summary judgment under Tex.R.Civ.P. 166a(i) is essentially a pretrial directed verdict, and a reviewing court applies the same legal sufficiency standard. *Wyatt v. Longoria*, 33 S.W.3d 26, 31 (Tex.App.-El Paso 2000, no pet.). The party moving for summary judgment on this basis must specifically state the elements as to which there is no evidence. *See* Tex.R.Civ.P. 166a(i). The burden then shifts to the nonmovant to produce evidence raising a fact issue on the challenged elements. *Id.* When reviewing a no-evidence summary judgment, the reviewing court views the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions. *Havner*, 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). Where the trial court's judgment does not specify the ground or grounds relied upon for its ruling, the summary judgment must be affirmed if any of the theories advanced is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

In their lawsuit, the Trahans asserted the following causes of action: breach of contract, theft, fraud, and breach of fiduciary duty. The Trahans sought exemplary damages for their fraud and breach of fiduciary duty claims. Lone Star challenged elements of each cause of action and the Trahans' exemplary damages claim.[4]

Relying on the HUD–1 Settlement Statement, the Trahans alleged that this closing statement was a contract between the Trahans and Lone Star, which Lone Star breached by not disbursing the tax monies out of the loan settlement funds as provided in the contract and by stopping payment on its refund check to the Trahans. In its no-evidence motion, Lone Star asserted that assuming the Settlement Statement was a contract, there was no evidence that Lone Star committed any breach. We agree. According to the Set-

4. On appeal, Lone Star asserts that the summary judgment can be affirmed because there was no evidence of any damages. Even if true, this basis was not alleged in Lone Star's no-evidence motion for summary judgment before the trial court, therefore we cannot affirm based on the lack of evidence on damages.

tlement Statement, the taxes were to be paid by the Trahans from the escrow funds. The Settlement Statement specifically states that the figures were estimates and that "all necessary adjustments must be made between Seller and Borrower direct...." The Trahans were aware that its previous mortgage lender had paid their property taxes, but that the payment had not yet posted. Therefore, the Settlement Statement was to the best of Ms. Cadena's knowledge an accurate account of the funds which were received and would be disbursed by Lone Star as part of the settlement of the transaction as of that date. The Settlement Statement does not require Lone Star to double pay the taxes in the event the taxes had already been paid on the borrower's account. Likewise, Lone Star was under no obligation to turn over any refund for overpayment of taxes to the Trahans, but rather the Settlement Statement merely required the parties to make any adjustments directly. The Trahans failed to raise a genuine issue of material fact as to the breach element of their claim.

█ In its no-evidence motion, Lone Star alleged there was no evidence that it committed theft, stole any of the Trahans' money or property, or committed any conduct with the requisite criminal intent. The Trahans based their theft cause of action on Section 134.001 of the Texas Civil Practices and Remedies Code. The Trahans claimed that Lone Star wrongfully appropriated their money by stopping payment on the check without their consent and with the intent to deprive them of their personal property. However, Mrs. Trahan stated in her affidavit that Ms. Cadena told her various reasons why she was not entitled to the money during their December 1, 2003 conversation. It is undisputed that Lone Star kept the funds in escrow until May 2004, at which point it turned over the funds with interest to Amerigroup and for the benefit of the Trahans' loan account. There is no evidence in the record that Lone Star intended to deprive the Trahans of their property when it stopped payment of the check.

█ In their fraud claim, the Trahans alleged that Lone Star made material and false representations to them at the closing that they would receive the refund from the overpayment of the taxes from the proceeds of their escrow account with their previous mortgage lender. They also claimed that Lone Star made a material and false representation to them after it stopped payment on the refund check by stating that it had sent the refund amount to their new lender. The Trahans alleged that Lone Star benefited from the fraudulent transaction because it knew it had not sent the refund and instead intended to keep the money, and when Lone Star admitted possession of the funds, it sent the money to the mortgage lender without their consent. In its no-evidence motion, Lone Star argued that there was no evidence that it committed any conduct with the requisite intent, in particular alleging no evidence that it made any false representations knowingly, recklessly, or with the intent that the Trahans rely on the representations. In Mrs. Trahan's affidavit, she stated that she and her husband signed the Settlement Statement based on what Ms. Cadena told them about the tax refund. However, there is no evidence in the record that Ms. Cadena made the representations to the Trahans with the requisite intent.

Finally, Lone Star challenged the Trahans' claim for breach of fiduciary duty, arguing there was no evidence of a breach of its fiduciary duty as an escrow agent, specifically, no evidence of any self-dealing, failure to conserve the escrow account, and pay it to whom it was owed, or failure

to make a full disclosure. Lone Star also noted that whether the refund was paid in cash to the Trahans or to their lender for their benefit, the escrow funds were ultimately paid to the Trahans and remained their money.

The Trahans' summary judgment evidence shows that during the closing on November 12, 2003, Mrs. Trahan told Ms. Cadena that their previous lender, Waterfield Mortgage, had already paid the ad valorem taxes which Amerigroup had added into the loan. According to Mrs. Trahan, Ms. Cadena said "she would refund the amount that Waterfield paid once the taxes paid by Waterfield were posted at the County Tax Office." On November 20, Ms. Cadena issued a check to the Trahans in the amount of $2,505.97, which they picked up the following morning on November 21. Later in the afternoon, Ms. Cadena called the Trahans and asked for the check back, but by then Mrs. Trahan had spent most of the money paying bills. Lone Star issued a stop payment on the check that same day, informing its banker that the check was "lost or misplaced." On December 1, 2003, Mrs. Trahan called Lone Star and spoke with Ms. Cadena. According to Mrs. Trahan, Ms. Cadena told her that Lone Star did not have the money and that it had been sent to Amerigroup. On December 17, 2003, Mrs. Trahan spoke with Mr. Blough and based on their conversation, Mrs. Trahan believed that Lone Star had sent the money to Amerigroup. In deposition testimony, Ms. Cadena stated that Lone Star did not send the $2,505.97 to the mortgage lender until May 2004 because of an oversight on her part. It was several months later and only after her attorney sent a demand letter, that Lone Star informed Mrs. Trahan that it was holding the $2,505.97 in escrow. Mr. Vereen stated in a May 14, 2004 letter that if an agreement was not reached between Amerigroup and the Trahans, Lone Star would have no choice but to interplead the money into the court registry. However, Lone Star did not interplead the money and instead sent it to Amerigroup without the Trahans' consent.

■ An escrow agent must be appointed through a specific legal document that imparts a specific legal obligation. *Bell v. Safeco Title Ins. Co.*, 830 S.W.2d 157, 160–61 (Tex.App.-Dallas 1992, writ denied). The escrow relationship is a stakeholder relationship that carries special duties, including those of a fiduciary nature. *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 438 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). An escrow agent owes fiduciary duties to both the buyers and the sellers of the property, including the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money placed in escrow and pay it only to those persons entitled to receive it. *See Pippen*, 439 S.W.2d at 665; *Bell*, 830 S.W.2d at 161. However, an escrow agent's duties are strictly limited and the scope of the agent's duties are defined by the escrow agreement. *Equisource Realty Corp. v. Crown Life Ins. Co.*, 854 S.W.2d 691, 697 (Tex.App.-Dallas 1993, no writ).

Pursuant to the Settlement Statement, Lone Star was authorized to make the distributions indicated on the statement, which noted that the tax amounts were estimates and that all necessary adjustments "must be made between Seller and Borrower direct; likewise any DEFICIT in delinquent taxes will be reimbursed to Title Company by the Seller." The Settlement Statement clearly provides that any disputes about the application of any alleged excess funds were a matter between the Trahans and their lender, not Lone Star. While Lone Star's conduct with re-

gard to the escrow account was less than forthright, it nevertheless, maintained the funds in an escrow account and sent the funds with interest to the Trahans' mortgage lender, at the lender's request, for the benefit of the Trahans' account. The scope of Lone Star's duties as escrow agent did not include interpleading the funds into a court registry or issuing the Trahans a cash payment in the amount of the disputed funds. The parties' escrow agreement specifically stated that adjustment in the funds would be made between the Trahans and Amerigroup. Lone Star had no duty to obtain the Trahans' consent before forwarding the disputed funds with interest to Amerigroup nor a duty to turn that money over to the Trahans directly. Lone Star's course of action with regard to the distribution of the disputed funds was consistent with its proscribed duties as escrow agent for the transaction, therefore the Trahans failed to bring forth more than a scintilla of evidence to support the breach element of their cause of action. We conclude the trial court properly granted Lone Star's no-evidence motion for summary judgment. Issue One is overruled. Given our disposition of this issue, the Trahans' challenge to the trial court's ruling granting Lone Star's motion to designate a responsible third party, Issue Six, is moot.

We affirm the trial court's judgment.